# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | |
|---|---|
| **IRA ANTHONY GUILLORY ET AL** | **CASE NO.  2:19-CV-01275** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **UNITED STATES OF AMERICA** | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Beginning on September 27, 2021, the court held a three-day bench trial on plaintiffs' claims of personal injury against the United States of America under the Federal Tort Claims Act ("FTCA"). At trial the government stipulated to liability but contested the extent of plaintiffs' damages. Having considered the evidence and applicable law, as well as the post-trial memoranda submitted by the parties, the court now issues its ruling.

## I.
### BACKGROUND

This litigation arises from a car accident that occurred on June 8, 2017. On that date John Tincher, an officer in the United States Army, was operating a rental vehicle in DeRidder, Louisiana, pursuant to government orders. Also in the car was Michael Wright, a civilian intelligence specialist employed by the Army. Tincher was backing out of a street-side parking space when his vehicle collided with a van driven by Tashona Guillory, who was stopped in the near lane of traffic with her four minor children (S.G., N.G., I.G., and Sh.G.) riding as passengers. After filing a claim with the Army and receiving no response, Mrs. Guillory and her husband timely filed suit in this court seeking to recover

for the alleged injuries suffered by her and her children. Doc. 1. The parties have stipulated that Tincher was acting in the course and scope of his employment with the Army at the time of the accident. Accordingly, the government is liable for the Guillorys' injuries that resulted from the accident under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, and this court has jurisdiction over the case under 28 U.S.C. §§ 1331 and 1346(b).

The government settled the claims of two of the minor children (I.G. and Sh.G.) but disputes the nature, extent, duration, and cause of the remaining plaintiffs' damages. The matter came before the court for trial without a jury. After considering the testimony of witnesses and exhibits entered into evidence, as well as the post-trial briefs filed by both parties, the court now makes its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that a conclusion of law constitutes a finding of fact, the Court also adopts it as such.

## II.
### FINDINGS OF FACT & CONCLUSIONS OF LAW

### A. The Accident

At the time of the accident it is undisputed that Tashona Guillory's vehicle was stopped. While the occupants of Tashona Guillory's vehicle testified that they felt a significant impact, as though their vehicle was being lifted off of the ground, Tincher testified that his vehicle was only moving at idle speed and that he had not yet placed his foot on the gas pedal. Doc. 49, att. 1, p. 65. The parties also offered conflicting testimony as to how the children reacted after the impact. The photographic evidence shows that the collision left only a small area of white paint marks on Tincher's rental vehicle. Doc. 49,

att. 12. There was a more sizable dent and areas of black discoloration on the door of Tashona Guillory's white minivan, however. Doc. 49, att. 11. Tashona Guillory was able to drive her vehicle home from the accident and no ambulance was called to the scene. Tr., Day 2, p. 193.[1]

### B. Tashona Guillory

#### 1. Treatment history

Tashona Guillory was 42 years old at the time of the accident, on June 8, 2017. About nine months prior to that, she sought care for numbness in her toes and was diagnosed with sciatica. Tr., Day 2, pp. 77–78; 147–48. At the time of the accident she was in the driver's seat of her vehicle and wearing her seatbelt. Tr., Day 2, pp. 141–42; *see*, e.g., doc. 48, att. 22, p. 2. When she realized that the collision was imminent, she reached back to grab Sh.G.'s car seat with her right arm. Tr., Day 2, pp. 141–42. She claims injuries to her neck, lower back, and elbow as a result of the accident. She first sought medical care for these injuries at the Beauregard Memorial Hospital emergency room on the night of June 9, 2017, over 24 hours after the collision. *See* doc. 48, att. 22, p. 2. There she complained of left-sided neck and head pain, which she rated at a 6/10. *Id.* She was diagnosed with a cervical strain and discharged that night with prescriptions for diclofenac (a nonsteroidal anti-inflammatory drug), tramadol (an opioid pain medication), and cyclobenzaprine (a muscle relaxant).[2] *Id.* at 11, 18. The following evening, however, she returned to the emergency room with complaints of neck and shoulder pain. *Id.* This time

---

[1] Transcript references refer to the rough draft of the trial transcript.
[2] She was also given a dose of diclofenac in the emergency room. Doc. 48, att. 22, p. 11.

she rated her pain as a 9/10. *Id.* She was given an injection of Toradol, an NSAID, and discharged that night with instructions to follow up with her primary care provider the following day. *Id.* at 19, 39. She followed up with her primary care provider, Dr. Jennifer Williams, on June 12 and June 15, 2017, complaining of neck and back pain.[3] Doc. 48, att. 28. She was prescribed a different NSAID and muscle relaxant and referred to physical therapy for her neck. *Id.*

Mrs. Guillory began physical therapy on July 20, 2017, at Beauregard Memorial Hospital, and was recommended a six-week course of twice-weekly sessions. Doc. 48, att. 23, pp. 23–25. Between August 8 and August 29, she attended four sessions where her therapist noted that she tolerated the exercises well but still complained of significant pain between sessions. *Id.* at 26–33. She also failed to appear at two appointments.[4] *Id.* She was discharged in December 2017 for failure to return. *Id.* at 34.

Mrs. Guillory also complained of neck pain and weakness in her left arm during clinical encounters at the Byrd Medical Clinic in August 2017, December 2017, and February 2018. Doc. 48, att. 24. She was referred to physical therapy again and completed ten sessions between January and February 2018, reporting improvement at her February 2018 visit to Byrd Medical Clinic. *Id.* at 12; doc. 48, att. 23, pp. 10–20. She still complained

---

[3] The government contends that Ms. Guillory only complained of neck/cervical spine pain during her encounters in 2017. However, she was diagnosed with both a cervical sprain and low back pain at her follow-up visit on June 12, 2017. Doc. 48, att. 28, p. 7. On the June 15 visit her only pain complaint related to her neck radiating into her mid-lateral back and no symptoms relating to her lower back were recorded. *Id.* at 3–6.

[4] One of the no-shows was due to car issues. At the second, on September 6, 2017, Mrs. Guillory was informed that her insurance authorization for treatment would soon expire and that she would need another referral if she wished to continue.

of pain at that visit, however, and her treatment provider noted that she should obtain an MRI if her symptoms persisted after completing physical therapy. Doc. 48, att. 24, p. 13.

Mrs. Guillory received MRIs of her lumbar and cervical spine in August 2018. Doc. 48, atts. 25 & 26. These studies showed herniation at C5-C6 and C6-C7 and "disc bulging and osteophytic ridging" at C4-C5, as well as a herniated disc at L4-L5. *Id.* She then saw Dr. Paul Fenn, an orthopedic surgeon, on August 24, 2018. Doc. 48, att. 27, pp. 93–97. At this visit she complained of neck pain radiating into her left arm, lower back pain radiating into her right buttocks and down the back of her leg, and right elbow pain shooting into her right forearm. *Id.* Dr. Fenn prescribed an NSAID and muscle relaxant, recommended physical therapy for the lumbar spine and cervical spine complaints, and ordered an MRI for the elbow. *Id.* at 97–98. The right elbow MRI was completed on September 24, 2018, and showed "irregularity and fluid signal involving common extensor tendon origin consistent with partial thickness tear." Doc. 48, att. 29. Mrs. Guillory then returned to Dr. Fenn on October 1, 2018, and asked for something stronger for pain control. Doc. 48, att. 27, p. 77. He prescribed hydrocodone, a cervical pillow, and cervical traction kit. *Id.* at 73, 80. At a follow-up visits on October 29 and December 3, 2018, Fenn noted that Mrs. Guillory was experiencing some improvement in her neck, lower back, and elbow after beginning physical therapy but that she still had pain in all of those areas. *Id.* at 66, 59–62. At the December appointment he also diagnosed her elbow condition as lateral epicondylitis (tennis elbow) and recorded that she should consider surgical repair if closed treatment failed. *Id.* at 61.

Mrs. Guillory failed to appear at follow-up appointments scheduled for January, February, and April of 2019. *Id.* at 53–48. Her last physical therapy date was November 1, 2018, and she did not attend any physical therapy sessions in 2019. Doc. 48, att. 30. Her only medical treatment or clinical encounter relating to this accident in 2019 was an office visit in May to Dr. Fenn. *See* doc. 48, att. 27, pp. 45–47; Tr., Day 2, p. 180. At this visit she continued to complain of pain, and Dr. Fenn discussed steroid injections for her back and surgery for her elbow as treatment options as well as continuing physical therapy. Doc. 48, att. 27, p. 46. However, Mrs. Guillory indicated that she was not interested in pursuing surgery or injections at this time. *Id.*

Mrs. Guillory's only other relevant medical records from 2019 were from a car accident in November. After the accident she was treated in the Beauregard Memorial Emergency Room and then a few days later at an urgent care clinic, with complaints of neck pain. Doc. 48, att. 31, p. 5; doc. 49, att. 22. She settled her claims relating to this accident for $2,500. Tr., Day 2, p. 178.

 Mrs. Guillory returned to the urgent care clinic on January 7, 2020, complaining that her neck and lower back pain from the 2017 accident had returned over the last two weeks. Doc. 48, att. 31, p. 2. She was prescribed an NSAID and muscle relaxant. *Id.* at 3. She followed up with Dr. Fenn on January 24, 2020, and stated that her right elbow had improved but not resolved, while her lower back and neck had not improved. Doc. 48, att. 27, pp. 32–36. Dr. Fenn also prescribed an NSAID and muscle relaxant, along with a home exercise program for the elbow, and referred her to Dr. John Crosby, a specialist in interventional pain management, for treatment of her neck and back. *Id.* at 30–36.

6

Dr. Crosby prescribed a muscle relaxant and tramadol, and administered a steroid injection to Mrs. Guillory's cervical spine on February 11, 2020. Doc. 48, att. 32, pp. 3–12. At a follow-up visit one month later, Mrs. Guillory reported "approximately 70% relief from the injection," including improved range of motion and a total reduction in neck pain. *Id.* at 13. On April 20, 2020, however, she reported that her neck pain had returned to a 3/10 while her lower back pain was at a 7/10. *Id.* at 17–20. She indicated that she was willing to return to physical therapy, but could not because of COVID-19 restrictions. *Id.* Dr. Crosby urged her to fill her tramadol prescription for pain relief. *Id.*

At a follow-up visit on June 1, 2020, Mrs. Guillory reported worsening neck pain and continued lower back pain. *Id.* at 22–23. Dr. Crosby prescribed Tylenol 3 and recommended that she complete physical therapy. *Id.* at 23–25. Mrs. Guillory was evaluated for physical therapy in August 2020 and attended one session. Doc. 48, att. 30, pp. 57–61. She saw Dr. Michael Lane, a colleague of Dr. Crosby's, for a routine follow-up on November 5, 2020. She stated that her neck and lower back pain remained unchanged but that she had been unable to resume physical therapy due to the hurricanes.[5] Doc. 48, att. 32, pp. 27–31. He refilled her Tylenol 3 and muscle relaxant prescriptions and directed her to resume physical therapy when able. *Id.* Mrs. Guillory reported that her pain symptoms were unchanged at a follow-up a month later, but that she had recently been approved for physical therapy and was awaiting an appointment. *Id.* at 33–36. She also saw Dr. Fenn on January 21, 2021, for a follow-up on her elbow. Doc. 48, att. 27, pp. 23–26.

---

[5] Hurricane Laura struck Southwest Louisiana on August 27, 2020, and Hurricane Delta made landfall in the same region on October 9, 2020.

He offered a steroid injection but she stated that she would hold off to see if she obtained results from physical therapy and bracing.[6] *Id.* She returned to physical therapy for an evaluation on January 6, 2021, and then attended five sessions between January 14 and March 22, 2021. Doc. 48, att. 30, pp. 41–52. At her final session, she reported that she was "tired of therapy and ready for all of this to be over" and that she continued to experience sharp pains in her neck. *Id.* at 41.

After her deposition, Mrs. Guillory was prescribed another round of physical therapy at two to three sessions per week for four to six weeks. Doc. 48, att. 33, p. 7. She completed six sessions between July and September 2021. Doc. 48, atts. 33 & 39. At the final session, on September 14, 2021, the therapist noted that she had made only slight progress toward meeting her goals and would benefit from continued skilled treatment. Doc. 48, att. 39, p. 5. The therapist also recorded that Mrs. Guillory's lack of progress was due to her non-compliance with therapy. *Id.*

Mrs. Guillory testified at trial that she had eight children still living at home, and that she had been homeschooling them since the onset of the COVID-19 pandemic in Spring 2020. Tr., Day 2, pp. 136–38. Prior to that point, her children attended school outside of the home. *Id.* at 183. Since then, however, her days were occupied keeping the children engaged in their required six hours of virtual schooling and fulfilling IEP requirements for the children who had been diagnosed with special needs, as well as caring for her bedridden father. *Id.* at 138–40. She testified that she still experienced arm pain but

---

[6] At follow-ups in March and June 2021 she also told Dr. Fenn that she was not interested in an injection at that time. *Id.* at 8, 18.

had avoided surgery for her elbow, due to the recovery time's impact on her obligations. *Id.* at 148–51. She also stated that she had received temporary relief from her neck symptoms after the first cervical injection, but had been reluctant to try another because the first one took a few days to take effect and had not provided lasting relief, and because Dr. Fenn had stated that he did not want to try another injection if she would ultimately pursue cervical decompression surgery. *Id.* at 152–53. She expressed, however, that she was ready to proceed with surgery for her elbow and would consider further injections for her cervical spine, though she did not have anything scheduled. *Id.* at 150–52.

Mrs. Guillory admitted that she did not receive her epidural spinal injection or consult with Dr. Crosby until after her November 2019 accident. *Id.* at 179–81. She also admitted to a 2016 emergency room visit, in which she had complained of numbness and tingling in her toes, and a 2018 visit after a fall at a Wal-Mart, in which she had complained of a right leg injury. *Id.* at 181–82. Finally, her medical bills show that she filled only three prescriptions related to the above injuries in 2018, three in 2019, but a total of nine in 2021. Doc. 48, att. 35, pp. 160–83. Mrs. Guillory had no explanation for the increase in medication over the past year. Tr., Day 2, pp. 185–86.

### 2.  Opinion Testimony

At trial the court heard from Drs. Burton, Fenn, Granger, and Lane. Dr. Matthew Burton, a neurosurgeon, testified that he saw Mrs. Guillory in May 2021. Based on that appointment and a review of her records, he diagnosed her with cervical and lumbar radiculopathy and considered her a candidate for decompressive surgery on her spine. Doc. 48, att. 38, pp. 6–7. At the time of her appointment, however, Mrs. Guillory told Dr. Burton

that she was not ready to consider that option and he recalled that she was "pretty fearful" of surgery. *Id.* at 12. As of August 2021, when Burton was deposed, Mrs. Guillory had not scheduled a return appointment. *Id.* Finally, Dr. Burton related Mrs. Guillory's condition to her 2017 accident but admitted that he had not received any information relating to the 2019 accident. *Id.* at 10. He also stated that he had not been given details on the 2017 collision, other than that another vehicle had backed into Mrs. Guillory, but that he instead based his causation opinion on the onset of symptoms and the presence of pathology on the MRI. *Id.* at 11–12.

Dr. Michael Lane, who specializes in physical medicine and rehabilitation and interventional pain management, testified that he began treating Mrs. Guillory in November 2020. Tr., Day 2, p. 6. He described the herniations and other findings on her cervical and lumbar spine from the August 2018 MRIs, and agreed that these would account for the symptoms noted when he examined her in November 2020. *Id.* at 8–13. He admitted that he was unaware of the November 2019 accident when he treated Mrs. Guillory. *Id.* at 43–44.

As of the November 2020 visit, Lane diagnosed her with the following conditions: cervical and lumbar radiculopathy, cervicalgia, sacroiliitis, trochanteric bursitis of the left and right hip, and lower back pain. *Id.* at 17. He also explained that it was common for patients with injuries to the neck and lower back to experience varying levels of pain and flare-ups caused by daily activities. *Id.* at 18–20. Finally, he testified that steroid injections could continue to provide relief and could be administered up to four times a year for many years to come, if needed. *Id.* at 23–25. He believed Mrs. Guillory would benefit from

injections to her cervical spine, lumbar spine, and sacroiliac joint, a medial branch block, and one twelve-visit cycle of physical therapy per year. *Id.* at 25–27. He stated that she would likely require injections regardless of whether she opted to have surgery, and would probably have some level of pain in these regions for the rest of her life even with the above-described treatments. *Id.* at 27–29.

Dr. Paul Fenn, the orthopedist who treated Mrs. Guillory, described his findings from his first examination of Mrs. Guillory in August 2018. Tr., Day 1, pp. 121–27. He also related all of her injuries to the June 2017 accident. *Id.* at 139. He opined that surgery was the best option for treating her elbow, and that without it she would experience lifelong pain in her injured elbow. *Id.* at 136–37. He emphasized, however, that surgery would only be the beginning of the elbow's recovery process and that several weeks of limited weight bearing and rehabilitation would follow. *Id.* at 137–38. From his last interaction with Mrs. Guillory, he believed she was trying to find a way to get the surgery done. *Id.* at 161–62.

Dr. Fenn did not believe Mrs. Guillory's lack of full compliance with her physical therapy regimen made a difference to her treatment options for her elbow. *Id.* at 160–62. He did not recommend that a patient pursue injections if she ultimately planned on getting the surgery, and did not believe that Mrs. Guillory would respond to anything short of surgery based on the duration of her symptoms and the lack of relief obtained from bracing or physical therapy. *Id.* at 133–34, 141–43. Ultimately, though, he stated that it was up to Mrs. Guillory whether she chose to continue living with her current level of discomfort. *Id.* at 143.

Dr. Shawn Granger, an orthopedic surgeon, performed the defense IME in January 2021. Tr., Day 2, pp. 58–65. He did not believe Mrs. Guillory's neck, lower back, or elbow would require surgical intervention over the next ten years as a result of the June 2017 accident. *Id.* at 67. Instead, he diagnosed her elbow condition as radial tunnel syndrome and did not attribute it to the car accident.[7] *Id.* He also found no signs of nerve root compression in Mrs. Guillory's neck or lower back, and opined that she suffered no disc herniation as a result of the accident. *Id.* at 67–69. He believed that Mrs. Guillory suffered from "a significant anxiety disorder with some catastrophization" and that she would benefit from counseling as well as nonoperative pain management interventions, like those she had pursued with Dr. Lane as well as chiropractic treatment and acupuncture. *Id.* at 69– 71. He ascribed her shoulder symptoms to an impingement syndrome, common in her age group and unrelated to the accident, rather than any injury to her cervical spine. *Id.* at 72– 77. He also believed, based on prior complaints of sciatica and numbness in her toes, that she had cervical and lumbar spondylosis before the accident. *Id.* at 78.

Dr. Granger admitted, however, that Mrs. Guillory's pre-accident history of back complaints did not represent a significant history of lower back issues. *Id.* at 83–84. He also admitted that he did not review the actual MRI films and could not challenge Dr. Burton's findings based on those films. *Id.* at 84–85. Instead, he only disputed the diagnoses based on his physical examination and records review. *See id.* at 85–86. Finally,

---

[7] He identified possible causes as obesity and overuse of the elbow strap prescribed to treat tennis elbow. *Id.*

he acknowledged that he only treated patients with spinal complaints up until the time they required intervention. *Id.* at 62–63.

### C. N.G.

#### 1. Treatment history

N.G. was nine years old at the time of the accident, and was seated in the front passenger seat of her mother's van with her seatbelt on. *See* Tr., Day 1, pp. 28–30. She saw Tincher's vehicle backing out and told her mother that his car was about to hit them. *Id.* at 30. Tincher backed into her side of the van and she testified that she hit her right shoulder on the inside of the vehicle door. *Id.* at 31–32. She was first treated at the Beauregard Memorial Hospital ER three days after the accident, complaining of sore legs and generalized body aches. Doc. 48, att. 4, p. 2. She was given a dose of Motrin and instructed to follow up with her primary care physician if she saw no improvement. *Id.* at 3–4, 16.

The following day N.G. saw her pediatrician, Dr. Michael Perkins, with a complaint of right arm pain. Doc. 48, att. 5, p. 2. Perkins prescribed ibuprofen with instructions to follow up in two weeks. *Id.* N.G. returned just one week later, with her mother reporting that N.G. was still having a lot of soreness when moving her right shoulder. *Id.* at 4. Mrs. Guillory declined X-rays at this time, stating that she did not feel the shoulder was broken and that N.G. moved it well without deficit. *Id.* at 5. Perkins prescribed Flexeril and instructed N.G. to follow up in two weeks. *Id.*

Two months later, N.G. saw nurse practitioner Michael Warren. Doc. 48, att. 6. At this visit her mother reported that N.G. had been having right shoulder pain, which Perkins was treating, and difficulty sleeping since the accident. *Id.* Warren advised that the

insomnia could be a normal stress response to a traumatic event and prescribed hydroxyzine. *Id.* N.G. then returned to Perkins's office on October 11, 2017. Doc. 48, att. 5, p. 6. At this time her mother reported that the shoulder only hurt her "every once and a while." *Id.* Perkins referred her to an orthopedist because of the continued pain. *Id.* at 7.

N.G. saw Dr. Jeffrey Traina for an initial consultation on November 13, 2017. Doc. 48, att. 7. At this visit he recorded right bicep tendon sheath pain which she rated at 7/10, impacting her activities of daily living, though she also reported that she had good days and bad days. *Id.* at 1–2. Based on his physical examination he determined that she might have a subluxing shoulder, and ordered X-rays. *Id.* at 7, 15. Six weeks later, Traina noted that her "[n]eck x-rays looked okay" with "[s]ome congenital subluxation but nothing acute." *Id.* at 9. At this visit N.G. reported her pain level as a 5/10, worsening with activity, with constant pain along with instability, stiffness, and weakness. *Id.* Traina prescribed physical therapy, at two to three sessions per week over eight weeks, and diagnosed N.G. with cervicalgia and an anterior subluxation of her right shoulder. *Id.* at 9–10. She completed eight sessions of physical therapy over January and February 2018. Doc. 48, att. 8. She frequently reported no pain, and on March 15, 2018, she was discharged from physical therapy based on a finding that she had met her long-term goals. *Id.* at 22.

In July 2018 N.G. was referred to a different orthopedist, Dr. David DeLapp, after complaining to her pediatrician of continued shoulder pain. Doc. 48, att. 9, p. 5. She told DeLapp that she was experiencing 8/10 pain in her shoulder.[8] *Id.* She was referred for more

---

[8] Mrs. Guillory also told Dr. DeLapp that N.G. had dislocated her shoulder in the accident, but admitted at trial that she was confused about the terminology. Tr., Day 2, pp. 199–200.

physical therapy and completed several sessions between August and November 2018, frequently reporting no pain but occasional tenderness. Doc. 48, att. 10. DeLapp also ordered an MRI of the affected shoulder, which was performed on November 5, 2018, and showed "mild supraspinatus and infraspinatus tendinopathy" along with "small effusion subacromial subdeltoid bursa." *Id.* at 11–12; doc. 48, att. 9, p. 16. After reviewing the MRI, Dr. DeLapp examined N.G. on November 8 and discussed treatment options with her. Doc. 48, att. 9, pp. 16–17. He explained that she would require at least three more months of physical therapy for improvement. *Id.* at 18. He offered a steroid injection, which Mrs. Guillory declined in favor of trying physical therapy for another month, and he also explained that N.G. could require surgical intervention if she continued to have instability or if arthritis resulted. *Id.*

DeLapp advised that N.G. follow up in one month. *Id.* After her final physical therapy appointment at the end of November 2018, however, she did not seek treatment for her shoulder until May 2020, when she obtained another orthopedic referral from her shoulder from her pediatrician. *See* doc 48, att. 39, p. 13. She saw Dr. Paul Fenn on November 30, 2020, who noted that she had received physical therapy in 2017 and 2018 with some improvement and that she also experienced some relief with over the counter medications. Doc. 49, att. 11, p. 35. He recorded that she was currently experiencing occasional shoulder pain that increased with reaching overhead and weight-bearing. *Id.* After reviewing N.G.'s MRI, he ordered another round of physical therapy and continued her on the over the counter medications. *Id.* at 38.

Between January and March 2021, N.G. completed another six sessions of physical therapy. Doc. 48, att. 12. At the final session, on March 22, 2021, N.G. reported that her shoulder pain was occurring intermittently and rated that pain at 2/10. *Id.* at 8. At a follow-up with Dr. Fenn around that time, she stated that she was also experiencing numbness and tingling in her shoulder at night and that physical therapy had improved but not resolved her issues. Doc. 48, att. 11, p. 17. Her report at a follow-up in June 2021 was much the same. *Id.* at 11. She returned for more physical therapy from July to September 2021. *See* doc. 48, att. 39, pp. 6–10. At a follow-up visit with Dr. Fenn on September 21, 2021, six days before trial, she again reported occasional pain that increased with activity and constant numbness and tingling in the mornings. *Id.* at 19. Dr. Fenn recommended that she continue with over-the-counter medications and physical therapy, and follow up in four to six weeks. *Id.* at 19–22.

At trial N.G. confirmed what she had told the defense IME physician—that she did not feel pain in her shoulder until a couple of days later, when she was trying to throw a football. Tr., Day 1, p. 58. N.G. and her family members testified that she was a natural athlete, but that the shoulder injury had restricted her recreational activities at home and school.[9] N.G. testified that the limitations from her shoulder impacted her ability to play basketball, throw a football, and do the exercises necessary to participate in fitness competitions she had previously enjoyed at school. *Id.* at 32–38. She also testified that the injury caused numbness in her arm when she lay down, which interfered with her sleep. *Id.*

---

[9] The government emphasized that the Guillory children are currently participating in virtual school. Mrs. Guillory testified that this was because of the COVID-19 pandemic and the risks to her youngest daughter, who was born prematurely and has asthma. Tr., Day 2, pp. 136–37.

at 38–41. Finally, she testified that she had been scared to ride in a vehicle for about two years following the accident and that she still experienced occasional sadness when thinking about it. *Id.* at 42–43.

### 2. Opinion Testimony

At trial the court heard from Drs. Fenn and Granger on N.G.'s injury and need for future treatment. Dr. Fenn, her treating orthopedist, testified that N.G. should be treated with physical therapy until she reached skeletal maturity. Tr., Day 1, p. 183. At that point, if she were still having symptoms, he would order an MRI to discover if something was torn and then plan the surgery around that. *Id.* at 183–85. Arthroscopic surgery, he testified, would cost around $40,000 to $50,000, and he believed that such a surgery lay in N.G.'s future. *Id.* at 185–90. He hypothesized that a labral tear might be causing N.G.'s continuing symptoms. *Id.* at 225. The earliest he would recommend surgery, however, would be age 16 and Fenn allowed that N.G.'s symptoms could improve as she aged and underwent further physical therapy. *Id.* at 187–89.

Dr. Granger, an orthopedic surgeon, performed the defense IME on N.G. in January 2021. Doc. 49, att. 20. Based on this examination and his review of records, he concluded that she had a grade one AC joint sprain with pain resulting from that injury. *Id.* at 4; Tr., Day 2, p. 108. He doubted that the accident was the predominant cause of the injury, noting that he commonly saw it with top-down impact in football players who felt immediate pain rather than with a sideways impact and pain first appearing days after the injury. Doc. 49, att. 20, p. 4; Tr., Day 2, pp. 109–10, 114–15. Instead he posited that she might have injured the arm around the time she first noticed the pain, when she was playing football a couple

of days after the accident. Doc. 49, att. 20, p. 4. He believed that N.G. could regain full functional use of the arm with no permanent sequelae if she continued anti-inflammatory medications and physical therapy, and that she was unlikely to require surgery in the next several years. Doc. 49, att. 20, p. 4; Tr., Day 2, p. 127. Based on his review of records and examination he found no evidence of a labral tear, and testified that he believed N.G. had achieved maximum medical improvement from her injury after her first round of physical therapy. Tr., Day 2, pp. 122–25.

### D. S.G.

#### 1. Treatment history

S.G. was ten years old at the time of the accident and was seated in the second row of the van, behind the driver's seat and wearing her seatbelt. Tr., Day 1, pp. 7, 81–82, 90, 96. Upon impact, she testified, she struck her forehead on the back of the driver's seat. *Id.* at 81–82. The blow left no bump or bruise. *Id.* at 97. S.G. and her family members testified, however, that she has experienced headaches since the accident and that she has them up to two to three times a week. *Id.* at 44, 83–85; Tr., Day 2, pp. 153–54.

S.G. first sought medical care at the Beauregard Memorial Hospital emergency room three days after the accident. Doc. 48, att. 15, p. 3. At that visit she complained of a headache that had started the previous day. *Id.* at 24. She was diagnosed with acute streptococcal pharyngitis (strep throat) and headache, given penicillin, and instructed to follow up with her primary care provider. *Id.* at 18. S.G. saw her primary care doctor, pediatrician Dr. Michael Perkins, the following day. Doc. 48, att. 17, p. 24. She described hitting the front of her head in the accident and stated that she had been having frontal

headaches at random times since the accident. *Id.* She returned four days later, still complaining of frontal headaches and ranking her pain at an eight out of ten. *Id.* at 38. This time Dr. Perkins diagnosed a neck spasm, prescribed a muscle relaxant, and ordered a head CT scan. *Id.* at 41. She also saw a nurse practitioner at the Byrd Medical Clinic in August 2017, complaining of severe headaches since the accident. Doc. 48, att. 16, p. 5. S.G. returned to Dr. Perkins in October, complaining of recurring headaches since the accident as well as nasal drainage, low grade fever, and sore throat. *Id.* at 44. Her mother stated that insurance had denied the CT scan. *Id.* Perkins diagnosed a chronic headache disorder and seasonal allergies, and noted his suspicion of thyroid issues due to other symptoms.[10] *Id.* However, no imaging was performed until March 2021.

In March 2018, pursuant to a referral from Dr. Perkins, S.G. saw pediatric neurologist Dr. Charles Ugokwe. *Id.* at 95. In the "History of Present Illness" section, S.G.'s symptoms are described in depth but there is no mention of the June 2017 accident. *Id.* Dr. Ugokwe treated S.G. for migraine headaches, recommending a headache diary and diet. *Id.* at 95–105; doc. 48, att. 18. At a follow-up visit in August 2018 he prescribed Maxalt and advised that S.G. follow up as needed. Doc. 48, att. 18.

S.G. never filled the muscle relaxant prescribed by Dr. Perkins or the migraine medication prescribed by Dr. Ugokwe, though she and her family members testified that she treated her headaches with Tylenol. *See* doc. 48, att. 21; Tr., Day 1, pp. 13, 67, 84; Tr.,

---

[10] S.G. saw Dr. Perkins again in November 2017 for an upper respiratory infection and in December 2017 for flu, listing headache among several other symptoms. Doc. 48, att. 17, pp. 55, 65. At a well child examination in January 2018, she presented with a fever, cough, "and a yellow/green runny nose with a frontal headache for the past 2-3 days" but made no mention of chronic headaches. *Id.* at 85.

Day 2, pp. 155–56. S.G. did not seek medical care for her headaches again until December 2020, when her mother, at the behest of plaintiffs' counsel, asked Dr. Perkins for a referral to Dr. Fayez Shamieh. Doc. 48, att. 17, p. 3.

Dr. Shamieh saw S.G. in January 2021. Doc. 48, att. 19. He recorded the accident in his history and linked it to the onset of her headaches, diagnosing her with post-traumatic migraines. *Id.* At his recommendation S.G. underwent a CT scan and EEG. The CT scan showed normal findings but the EEG showed moderately slow waves in the occipital region. *Id.* at 5, 10–11. Shamieh prescribed propranolol and Periactin to treat and prevent the headaches. *Id.* at 4, 6, 9. At a follow-up visit on July 30, 2021, Dr. Shamieh noted that the EEG results had improved. *Id.* at 9. Mrs. Guillory reported at that visit that S.G. continued to have headaches nearly every day and that the medication was not working. *Id.* Shamieh increased the dosage on the propranolol. *Id.* Pharmacy records show, however, that up to that point S.G.'s 30-day Periactin prescription was only filled once in January and not refilled until July 15, and her 30-day propranolol prescription was only filled once in April. Doc. 48, att. 21.

### 2.  Opinion testimony

Dr. Perkins testified that S.G.'s 2017 headache symptoms could be linked to the accident and that, while strep throat could cause a headache, he would expect it to resolve with the other symptoms. Doc. 49, att. 3, pp. 16–21. He agreed that reports of "off and on" headaches in her October 2017 visit and the absence of any such complaints in other visits would contradict S.G. and her mother's reports of severe headaches two to four times per week over that time period. *Id.* at 54–61. He also allowed that other conditions, including

allergies and sinus infections, noted in her chart from 2017 to 2019 could cause headaches. *Id.* at 63–69. He stated, however, that he would defer to a neurologist's opinion on the diagnosis. *Id.* at 36.

As noted above, Dr. Shamieh diagnosed S.G. with post-traumatic migraines. He testified that he would expect the headaches to continue, requiring periodic follow-ups and medication, for a few years but to improve by the time she reached adulthood. Doc. 49, att. 2, pp. 27–35, 73–74. He admitted that he had no information on the severity of the accident and that he had not reviewed any medical records other than his own. *Id.* at 35–37. He also agreed that some of S.G.'s prior headache complaints to Dr. Perkins could have been related to viruses or allergies. However, he found her EEG results and history to be consistent with trauma-induced migraines. *Id.* at 22–25. He also agreed that severity of headache and other symptoms would wax and wane with this condition. *Id.* at 81–82. After reviewing photographs of the vehicles after the accident, however, he declined to offer an opinion on whether it looked like the type of impact "that would cause an otherwise healthy 10-year-old to have four years of headaches" because he had seen patients have lots of problems as a result of minor traumas. *Id.* at 38.

### E.  Damages

"The FTCA authorizes civil actions for damages against the United States . . . under circumstances in which a private person would be liable under the law of the state in which the negligent act or omission occurred." *Quijano v. United States*, 325 F.3d 564, 567 (5th Cir. 2003). Accordingly, Louisiana substantive law applies here. The court uses this law to analyze each plaintiff's claim for past and future medical expenses as well as general

damages to compensate for pain and suffering and loss of enjoyment of life. *See* doc. 1, p. 5; doc. 51.

In a tort case, the plaintiff generally has the burden of proving each element of her claim—including causation of damages—by a preponderance of the evidence. *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La. 1993). A plaintiff may recover for past and future medical expenses caused by the defendant's tortious conduct. *Menard v. Lafayette Ins. Co.*, 31 So.3d 996, 1006 (La. 2010). The plaintiff must establish, however, that she "incurred past medical expenses in good faith as a result of [her] injury and future medical expenses will more probably than not be incurred." *Id.* The factfinder is given great deference in its assessment of quantum for both general and special damages. *Guillory v. Lee*, 116 So.3d 1104, 1116 (La. 2009). Where the finding is based on determinations relating to the credibility of witnesses, the award can only be overturned on a showing of manifest error. *Jones v. Bravata*, 980 So.3d 226, 233 (La. Ct. App. 1st Cir. 2019) (citing *Adams v. Rhodia, Inc.*, 983 So.2d 798, 806 (La. 2008)).

### 1. Tashona Guillory

Plaintiffs have submitted medical bills totaling $33,993.69 for Tashona Guillory, for treatment between the time of the accident and September 14, 2021 (two weeks before trial).[11] Doc. 48, att. 35, pp. 83–183. They also request $436,415.00 in future medical expenses, covering the elbow surgery described by Dr. Fenn, the lumbar and cervical spine

---

[11] Under Louisiana law, a plaintiff whose medical expenses are covered by Medicaid cannot recover the write-off amount. *Bozeman v. State*, 870 So.2d 692, 705–06 (La. 2004). The parties have stipulated that the plaintiffs, including Mrs. Guillory, were covered by Medicaid at the time of the accident and plaintiffs do not appear to make a claim for any write-off amount.

surgeries described by Dr. Burton, the medial branch block and annual twelve-visit cycle of physical therapy recommended by Dr. Lane, and five years of cervical and lumbar epidural spinal injections at a rate of three injections per year, to help her endure until her youngest child is older and she can have adequate time for surgery and recovery. The government maintains that no future medical is owed and that past medical should be limited to the treatment for her cervical spine prior to the November 2019 accident, representing just $6,632.03 of the bills already incurred.

The court finds it more probable than not that all of Mrs. Guillory's prior medical treatment is related to the June 2017 accident. There is insufficient evidence relating to the November 2019 accident to determine that it was an independent cause of any injury. Though Mrs. Guillory had few early complaints of lumbar pain, the initial one made immediately after the accident along with the imaging results and expert testimony persuade the court that all of the injuries of which she now complains were more likely than not caused by the accident. Due to Mrs. Guillory's reluctance to pursue various treatment options or even regularly fill prescriptions, the court finds no basis for awarding damages for future medical treatment. However, the evidence does support a finding that Mrs. Guillory has experienced pain and limitations from her injuries and will continue to do so in the future. Accordingly, the court will award **$33,993.69** in past medical expenses and **$65,000** in past and future pain, suffering, and loss of enjoyment of life.

### 2.  N.G.

As for N.G., the medical bills submitted by plaintiffs through trial total $7,317.89. *See* doc. 48, att. 14. Plaintiffs also seek an award of $40,000 to $50,000 in future medical

costs for arthroscopic surgery. The government argues that N.G. achieved maximum medical improvement for her arm in March or December 2018, after completing the respective cycles of physical therapy, and that her past medical expenses should be cut off after that point. It also asserts that plaintiffs have not shown a sufficient likelihood that N.G. will require surgery in the future.

The court is persuaded by the expert testimony that all of N.G.'s past medical costs are justified and related to the accident. While Dr. Granger disputed the mechanism and exact nature of her injury, he did not dispute that her shoulder was injured. The court finds no basis for doubting N.G.'s testimony regarding the recurrence of her symptoms. It also does not count time periods in which she sought no treatment against her, given that N.G. is one of several children in a busy household and that the injury never caused constant or debilitating pain.

Dr. Granger's speculation that the injury might have been caused by playing football around that time does not suffice to undermine the causal connections established by N.G.'s treatment record and testimony.[12] Given the agreement as to the existence of the injury, and Dr. Fenn's credible testimony that surgery will likely be required to stabilize the joint, an award of damages to cover the cost of that operation is justified. Finally, the court is persuaded by the testimony regarding the limitations the injury has caused for N.G.'s usual enjoyment of sports and other activities. Accordingly, it will award **$7,317.89** in past

---

[12] The court's estimation of this witness's credibility was impacted by the skeptical and hostile tone of his report. There Dr. Granger questioned whether N.G. could have purposefully injured herself and recommended that she be evaluated for psychopathology based on her pain complaints. *See* doc. 49, att. 20. He provided no adequate explanation for these suppositions during his testimony.

medical expenses, **$50,000** in future medical expenses, and **$30,000** in past and future pain, suffering, and loss of enjoyment of life.

### 3.  S.G.

As for S.G., the medical bills submitted up to the time of trial total $5,901.95. Doc. 48, att. 21. Plaintiffs also seek $4,500 in future medical costs for further treatment with Dr. Shamieh. The government does not dispute that S.G. suffers from migraines, but asserts that plaintiffs have failed to show they are causally connected to the accident. Accordingly, it maintains, no damages are owed relating to this injury.

Based on S.G.'s record of headache complaints, as well as the testimony of Dr. Shamieh and the EEG findings, the court finds it more likely than not that the accident was the cause of S.G.'s headaches. While the government disputes that S.G. could have hit her head in the manner described, it has not produced any evidence on this point. The court credits the testimony of Dr. Shamieh, as well as the testimony of S.G. and her family members on the suffering caused by the headaches. At the same time, it also relies on Dr. Shamieh's expectation that S.G. will see significant improvement in her headaches within the next few years. The court will therefore award **$5,901.95** in past medical costs, **$4,500.00** in future medical costs, and **$60,000.00** in past and future pain, suffering, and loss of enjoyment of life.

## III.
### CONCLUSION

For the reasons stated above, judgment will be entered for the plaintiffs in the following amounts:

- Tashona Guillory:

    o **$33,993.69** in past medical costs

    o **$0** in future medical costs

    o **$65,000** in past and future pain, suffering, and loss of enjoyment of life

- N.G.:

    o **$7,317.89** in past medical costs

    o **$50,000** in future medical costs

    o **$30,000** in past and future pain, suffering, and loss of enjoyment of life

- S.G.:

    o **$5,901.95** in past medical costs

    o **$4,500** in future medical costs

    o **$60,000** in past and future pain, suffering, and loss of enjoyment of life

**THUS DONE AND SIGNED** in Chambers on this 8th day of November, 2021.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**